COMMONWEALTH *vs.* MICHAEL J. MAXIM
(and a companion case[1]).

No. 97-P-0010.

Barnstable. November 12, 1997. - June 11, 1998.

Present: BROWN, SMITH, & LAURENCE, JJ.

Further appellate review granted, 428 Mass. 1102 (1998).

*Municipal Corporations,* By-laws and ordinances, Shellfish. *Shellfish.*

Discussion of native American fishing rights. [50-52]
Native Americans, charged with criminal offenses under a municipal by-law
   prohibiting the taking of shellfish by hand on certain days, were entitled to
   findings of not guilty, where their right to fish was protected by the Treaty
   of Falmouth of 1749, and where the Commonwealth did not prove beyond
   a reasonable doubt that the by-law was a reasonable and necessary
   conservation measure that did not discriminate against native Americans.
   [52-53]

COMPLAINTS received and sworn to in the Barnstable Division
of the District Court Department on February 9, 1996.

The cases were heard by *George H. Lebherz, Jr.,* J.

*Peter P. d'Errico* for Michael J. Maxim.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

*Robert T. Doyle, Jr.,* for David S. Greene, was present but did
not argue.

BROWN, J. The Commonwealth sought and obtained convictions of two members of the Mashpee Wampanoag tribe for
violating the town of Bourne's ordinance prohibiting recreational
shellfishing on certain days of the week. The defendants, who
were gathering clams by hand and rake to feed their families,
claim that they were exercising their rights as native Americans
(both aboriginal rights and rights reserved by their ancestors
under certain treaties with Massachusetts) to fish for sustenance
without restriction by town ordinance. This dispute, which

[1]Commonwealth vs. David S. Greene.

would have been ideally suited for resolution in a civil action styled as a request for declaratory relief, has been inartfully forced into a criminal proceeding, which perforce requires us to employ the traditional standard of proof beyond a reasonable doubt and the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States*, 401 U.S. 808, 811-812 (1971). See *United States* v. *Bass*, 404 U.S. 336, 347-348 (1971); *Commonwealth* v. *Hrycenko*, 417 Mass. 309, 317 (1994).

The defendants, in support of their claim to protection by treaty of their fishing rights, point to the Treaty of Falmouth of 1727 (which further ratified certain prior treaties) and to the Treaty of Falmouth of 1749. The latter, among other things, "[s]av[es] to the Tribes of Indians within His Majesty's Province . . . the priviledge of fishery, hunting, and fowling as formerly."[2]

The district attorney argues on appeal that the two treaties apply only to certain named tribes. The language quoted above, however, appears to refer to all the tribes living within the colony. Moreover, the canons of construction applicable to treaties with native Americans[3] require that any ambiguities in such treaties must be construed in favor of the native Americans. *Antoine* v. *Washington*, 420 U.S. 194, 199 (1975). *Lac Courte Oreilles Band* v. *Voigt*, 700 F.2d 341, 350-351 (7th Cir. 1983). In addition, a practical construction "in the sense in which [the words] would naturally be understood by the Indians" may be considered in interpreting treaties. *Id.* at 350, quoting from *Jones* v. *Meehan*, 175 U.S. 1, 11 (1899). Here, the right of native Americans to harvest shellfish without interference has been recognized by statutes of the Commonwealth, beginning with the Acts of 1795, c. 71, § 5,[4] and such rights, it appears, have been continuously exercised. A resolution adopted by the Massachusetts House of Representatives dated November 9,

[2]The Treaty of 1727 contains similar language. The paragraph from which the quoted language is taken purports to bind and refers to other Indians in the colony as well as certain named tribes.

[3]While these canons were set out in Federal cases involving treaties with the United States, we think they also apply to treaties involving the Commonwealth of Massachusetts.

[4]Although the reservation of these rights to native Americans in these enactments could have had a basis or bases other than the two treaties mentioned, these provisions could also be construed as recognition of the rights from the treaties. See also discussion *infra*.

1982, again recognized "the ancient and aboriginal claim of Indians within the Commonwealth . . . to hunt and fish the wildlife of this land for the sustenance of their families." The resolution noted that "this ancient and aboriginal claim has been recognized by treaties, including the Falmouth Treaty of 1749," and pointed out that, although "this ancient and aboriginal claim was ignored in the revision of the General Laws by the Acts of 1941," the "Indians . . . have continued, even after 1941, to make claim upon the wildlife of this land as a source of food for the sustenance of their families" and that the Commonwealth by executive orders, agency agreements, and legislation has continued, even after 1941, to recognize the "special status of Indians within the state."[5]

At the trial of this case, the district attorney conceded that aboriginal fishing rights have long been recognized in the Commonwealth and that the Commonwealth recognizes that native Americans have the right to fish without a permit.[6] The district attorney maintained, however, that the restriction on gathering shellfish by hand on certain days was reasonable and necessary for purposes of conservation and was therefore applicable to native Americans as a conservation measure. The District Court judge agreed, ruling that the regulation was reasonable and necessary for the conservation of shellfish and that the defendants were therefore subject to it.

Even where protected by treaty, fishing rights "may be regulated by the State in the interest of conservation, provided the regulation . . . is a reasonable and necessary conservation measure, *Washington Game Dept.* v. *Puyallup Tribe*, 414 U.S.

---

[5]The district attorney also points out in its brief that the treaties of 1727 and 1749 are not mentioned in *Mashpee Tribe* v. *Secretary of Interior*, 820 F.2d 480 (1st Cir. 1987), and that that case states the Massachusetts Indians are "remnants of tribes never recognized by the treaties or executive acts of the United States . . . ." *Id.* at 484, quoting from *Elk* v. *Wilkins*, 112 U.S. 94, 108 (1884). However, that case involved a different question — whether the Federal government had recognized tribal status for purposes of asserting their claim to aboriginal title. Here, the treaties in question were with the government of Massachusetts and the rights involved are not title rights, but fishing rights. Fishing rights can exist independently of land rights. See *United States* v. *Winans*, 198 U.S. 371, 381-382 (1905); *Oregon Dept. of Fish & Wildlife* v. *Klamath Indian Tribe*, 473 U.S. 753, 765-766 (1985); *Lac Courte Oreilles Band* v. *Voigt*, 700 F.2d 341, 352 (7th Cir. 1983).

[6]The by-law at issue here also requires a permit. The defendants originally were also charged with shellfishing without a permit; that charge was dismissed.

44 (1973); *Tulee* v. *Washington*, 315 U.S. 681, 684 (1942), *and* that its application to the Indians is necessary in the interest of conservation" (emphasis original), *Antoine* v. *Washington*, 420 U.S. at 207, and "does not discriminate against the Indians." *Puyallup Tribe* v. *Department of Game of Washington*, 391 U.S. 392, 398 (1968). *Department of Game of Washington* v. *Puyallup Tribe*, 414 U.S. at 45, 48. Here, other than a bare assertion by a selectman under cross-examination that the purpose of the by-law was conservation, there was no evidence showing that this was a necessary conservation measure. Moreover, in light of the fact that the by-law permits commercial fishing (in which "jet pumps" are used) with a far higher catch allowed than that otherwise permitted to individuals fishing by hand and rake, on the same day shellfishing by hand for subsistence was prohibited to these individual defendants, it cannot reasonably be said that the by-law's application to the Wampanoag was "necessary in the interest of conservation." *Ibid.* In such circumstances, the restriction of the Wampanoags' fishing by rake and hand for sustenance would not be permissible, see *Antoine* v. *Washington*, 420 U.S. at 207-208, especially in light of the permitted commercial fishing, using jet pumps, at the same time. Compare *Department of Game of Washington* v. *Puyallup Tribe*, 414 U.S. at 46-48. Cf. *United States* v. *Winans*, 198 U.S. 371, 382, 384 (1905).

In sum, the record in this case leaves us with the following: (1) a lack of clarity that the by-law's restriction on "recreational" shellfishing was intended to apply to the Wampanoags' shellfishing for subsistence; (2) indication of a long history of recognition of the fishing rights of native Americans by the Commonwealth and a lack of showing that the Commonwealth intended to authorize the town to restrict such rights; (3) the protection by the Treaty of Falmouth of 1749 of native American fishing rights within the Commonwealth (and the fact that they possess aboriginal rights to fish even in the absence of treaty protection); (4) the absence of a showing of a conservation necessity; and (5) the absence of a showing that application of the by-law to the defendants was essential and nondiscriminatory. We therefore conclude that the defendants' right to fish was protected by treaty and that, given the absence of a showing of an essential conservation purpose, whose application to the defendants is essential and nondiscriminatory, the defendants' criminal convictions may not stand. Even were it

uncertain whether the two treaties in question protected the defendants here, it would be necessary to reverse the criminal convictions, under the principle that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis* v. *United States, supra.* See *United States* v. *Bass,* 404 U.S. at 347-348; *Commonwealth* v. *Hrycenko,* 417 Mass. at 317 ("the basic premise of the criminal law [is] that ambiguities and doubts are to be resolved in favor of the accused").

The judgments are reversed, the findings are set aside, and judgments shall enter for the defendants.

*So ordered.*